IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

John Doe,                        )
                                 )
             Plaintiff,          )
                                 )
        v.                       )     No. 05 C 4405
                                 )
William Biang and the City       )
of Waukegan,                     )
                                 )
             Defendants.         )

## MEMORANDUM OPINION AND ORDER

Although Illinois state courts have parsed through numerous challenges to the Sex Offender and Child Murderer Community Notification Law ("Notification Law," 735 ILCS 152/101 to 152/999),[1] this case apparently presents the first opportunity for a federal court to do the same. At least no reported federal cases have been located, and so publication of this memorandum opinion and order seems appropriate.

Here John Doe ("Doe") has sued Waukegan Police Chief William Biang and the City of Waukegan (collectively "Waukegan," treated as a singular noun) seeking a determination that Section 120(b), both facially and as applied, violates the United States and Illinois Constitutions. Doe has asserted six claims, arguing

---

[1] All citations to the Notification Law will take the form "Section --," omitting the prefatory 735 ILCS 152/. Because the different section numbering poses no potential confusion, all citations to the Illinois Sex Offender Registration Act ("Registration Act," 735 ILCS 150/1 to 150/12) will also take the form "Section--," omitting the prefatory 735 ILCS 150/.

that Section 120(b) (1) constitutes ex post facto punishment, (2) violates procedural due process, (3) violates substantive due process, (4) is unconstitutionally vague, (5) amounts to an unconstitutional delegation of power and (6) deprives him of equal protection of the law.

Waukegan has responded with a Fed.R.Civ.P. 12(b)(6) motion challenging the legal sufficiency of all six claims. For that purpose Doe's allegations, coupled with all reasonable favorable inferences, must be accepted as true (Bressner v. Ambroziak, 319 F.3d 478, 480 (7th Cir. 2004)), and dismissal is warranted only "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). For the reasons stated in this memorandum opinion and order, only Doe's substantive due process claim (indeed, only one facet of that claim) survives Waukegan's motion to dismiss.[2]

## Background[3]

Doe was convicted of aggravated criminal sexual assault on a

---

[2] Although not specified in either party's submissions, this Court has jurisdiction over this action under 28 U.S.C. §§1331 and 1367(a).

[3] Doe tendered an initial memorandum in support of his Amended Complaint for declaratory and injunctive relief and a second memorandum (which incorporated parts of the earlier memorandum) in response to Waukegan's motion to dismiss. Those memoranda will respectively be cited "D. Mem. I-" and "D. Mem. II-."

2

person over the age of 18 on September 28, 1988 (Compl. ¶11). He
was released from confinement on or about February 12, 2001 and
has complied with the Notification Law's registration
requirements (id. ¶12). Upon his release Doe first lived in
North Chicago, but he has since moved to Waukegan, where he
currently resides (id. ¶14). Doe is employed as a punch-press
operator in a manufacturing plant (id. ¶15).

On July 18, 2005 two Waukegan police officers delivered to
Doe a 30-day notice that the Waukegan Police Department intended
to distribute a flyer to persons living within 500 feet of Doe's
residence. That flyer identified him as a sex offender and
published his name, date of birth, height, weight, race, sex,
home address, photograph and conviction for aggravated criminal
sexual assault. Waukegan explained that "not everyone has access
to the Internet; we are providing this information as a service
to the community" (id. Ex. A).

## Registration Act and Notification Law

In Illinois convicted sex offenders such as Doe are subject
to both the Registration Act and the Notification Law.[4] Under
the Registration Act a sex offender is required to provide his or
her municipal or county law enforcement officials with his or her
current address, photograph, place of employment, employer's

---

[4] To be a "sex offender" under Section 2(A), an individual
must have been convicted or found not guilty by reason of
insanity of a "sex offense" as defined under Section 2(B).

3

telephone number and school attended (Section 3(e)). If adjudicated a sexually dangerous or violent person or a sexual predator, an offender must register for his or her entire life (Section 7). Otherwise a sex offender's duty to register lasts for a period of 10 years after conviction or adjudication if not incarcerated, or for 10 years following parole, discharge or release from confinement (id.).

Convicted sex offenders are also subject to the provisions of the Notification Law (Sections 115(a) and (b) and 120(a) to (c)). That statute requires the Department of State Police to maintain a Sex Offender Database and to post information in that Database on the Internet (Section 115(a)and (b)), to notify school boards and child care facilities about sex offenders in their respective counties (Section 120(a)) and to make information about sex offenders available and "open to inspection by the public" (Section 120(c)). It also provides (Section 120(b)):

The Department of State Police and any law enforcement agency may disclose, in the Department's or Agency's discretion, the following information to any person likely to encounter a sex offender, or sexual predator:
   (1) The offender's name, address, and date of birth.
   (2) The offense for which the offender was convicted.
   (3) Adjudication as a sexually dangerous person.
   (4) The offender's photograph or other such information that will help identify the offender.
   (5) Offender employment information, to protect public

4

safety.[5]

Waukegan intends to distribute the flyer about Doe pursuant to
Section 120(b).

## Ex Post Facto

In his first challenge to the Notification Law, Doe argues
that Section 120(b) constitutes an ex post facto punishment in
violation of the United States and Illinois Constitutions. It is
clear that Doe's state law claim is foreclosed under People v.
Malchow, 193 Ill.2d 413, 424, 739 N.E.2d 433, 440 (2000).
Although Doe tries to wriggle out of the Malchow holding by
arguing that the opinion there did not appropriately address
Section 120(b), that contention has no merit. Malchow, id.
repeatedly and expressly evaluated Section 120(b)'s provision for
public disclosure in its ex post facto analysis of the
Notification Law.

Even though Malchow addressed both the federal and state Ex
Post Facto Clauses, of course its holding is binding only as to
the latter (see Carmell v. Texas, 529 U.S. 513, 544 n.31 (2000)).

---

[5] Notably, only sex offenders that are required to register
under Section 3 are subject to public disclosure under Sections
120(a) and (c). By its terms, however, Section 120(b) is not so
limited: Following revisions effective August 22, 2002 all sex
offenders now fall under Section 120(b)'s purview (2002 Ill.
Legis. Serv. 92-828). That difference is of some significance.
Because Section 120(b) is not limited to sex offenders who are
required to register under the Registration Act, there is no
specified temporal limit on how long a sex offender can be
subject to community notification under its provisions.

5

To determine whether a statute constitutes retroactive punishment forbidden by the federal, a court (Smith v. Doe, 538 U.S. 84, 92 (2003)):

> must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." Kansas v. Hendricks, 521 U.S. 346, 361 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" Ibid. (quoting United States v. Ward, 448 U.S. 242, 248-49 (1980)).

"Only the clearest proof" of a statute's punitive purpose or effect will override a finding that the legislature intended to enact a civil regime (id. at 92). In their efforts to determine that effect, courts evaluate a number of the factors noted in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963), focusing specifically on whether the statutory scheme (Smith, 538 U.S. at 97):

> has been regarded in our history and traditions as punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

Smith is a formidable foe to Doe's federal claim. That case held that Alaska's Sex Offender Registration Act ("Alaska Act") did not violate the federal Ex Post Facto Clause (id. at 105-06). Like the Notification Law, the Alaska Act allows for public dissemination of extensive information about a sex offender-- name, aliases, address, photograph, physical description, license

6

plate number, place of employment, date of birth, crime for which
convicted, date of conviction, place and court of conviction and
length and conditions of sentence--based solely on that
offender's past conviction (id.at 91). Although the disclosure
medium is not statutorily prescribed, Alaska has chosen to make
that information about sex offenders public by posting it over
the Internet (id.).

Despite the similarities between the Alaska Act and
Notification Law, Doe asserts that Smith is distinguishable on
two grounds. First, as to legislative intent, Doe argues that
Section 120(b) is different from the Alaska Act because the
former is codified in the Illinois Code of Corrections while the
notification provisions of the Alaska Act are located in that
state's "Health, Safety, and Housing Code" (D. Mem. 17-18).
Second, Doe contends that Smith's "effects" determination is
distinguishable because that case dealt only with passive
Internet notification and not the active notification
contemplated under Section 120(b).

As for Doe's first attempted distinction, although a court
may take into account the manner in which a statute is codified
in making its determination of legislative intent, "[t]he
location and labels of a statutory provision do not by themselves
transform a civil remedy into a criminal one" (Smith, 538 U.S. at
94). And that factor alone is hardly sufficient to warrant a

departure from <u>Smith</u>. Instead, guided not only by <u>Smith</u> but by the readings of the Illinois statute in <u>Malchow</u> and <u>People v. Cornelius</u>, 213 Ill.2d 178, 821 N.E.2d 288 (2004), this Court finds, for purposes of ex post facto analysis, that the Illinois General Assembly intended the Notification Law--including Section 120(b)--to protect the public rather than to punish sex offenders.

As for Doe's second contention, his able appointed counsel spends little time arguing that the active-passive distinction impacts <u>Smith</u>'s findings as to three of the <u>Mendoza-Martinez</u> factors--that the Alaska Act (1) does not impose an affirmative restraint or disability, (2) is "consistent with the regulatory objective" and (3) is rationally connected to a non-punitive purpose (<u>id</u>. at 99-102)[6]--and thus controls their application to his case. Doe rather contends that because Section 120(b) involves active dissemination, it necessarily has different historical analogues and a greater degree of excessiveness than was true of the Alaska Act under <u>Smith</u>.

In that respect <u>Smith</u>, 538 U.S. at 98 rejected a claim that

_____

[6] Because any inquiry into whether a statute is rationally connected to a non-punitive purpose and whether it is excessive necessarily overlap, it might perhaps be said that Doe contests <u>Smith</u>'s finding as to the former in his argument about Section 120(b)'s excessiveness (see D. Mem. II-18). But even if that were the case, this Court rejects both (1) Doe's excessiveness argument and (2) any challenge he may have made on the same ground to Section 120(b)'s rational relationship to protecting the public.

the Alaska Act's notification provisions resembled colonial

shaming, humiliation and banishment because those early

punishments "involved more than the dissemination of information.

They either held the person up before his fellow citizens for

face-to-face shaming or expelled him from the community." Smith,

id. contrasted such punishments with the Alaska Act, which

involved only "the dissemination of accurate information about a

criminal record, most of which is already public." Moreover,

Smith, id. at 99 pointed out that Internet notification:

> is more analogous to a visit to an official archive of
> criminal records than it is to a scheme forcing an offender
> to appear in public with some visible badge of past
> criminality.

Like the notification provided for by the Alaska Act,

Section 120(b) allows for the disclosure of truthful and largely

public information. But Waukegan's proposal to pick out Doe from

a corpus of offenders and distribute flyers containing Doe's

picture, conviction and other identifying information more

closely resembles colonial shaming than did the procedure in

Smith.[7]   Section 120(b) notification is not akin "to a visit to

___

[7] Seling v. Young, 531 U.S. 250, 263 (2001) held that a
plaintiff cannot mount an as-applied ex post facto challenge.
But Seling, id. at 266-67 left open the question whether
implementation of a statute can factor into a court's
determination of whether a statute is civil or punitive in the
first instance. By considering the manner in which Alaska
implemented its notification law--through the Internet--Smith
seems to suggest that implementation is a relevant factor in
evaluating whether a law violates the Ex Post Facto Clause (see
Smith, 538 U.S. at 99, 104-05; see also id. at 106-07 (Thomas,

9

an official archive of criminal records" (id. at 99)--instead it involves active dissemination by the police of a message that otherwise would not be heard. Indeed, Waukegan has stated that it sought to distribute the flyers because not everyone could access the Internet and any information it included as to sex offenders. Moreover, as with the early types of punishment, it seems clear that at least one purpose of notification is to make the public aware of sex offenders so that the public can protect and distance itself from them.

As for Doe's excessiveness charge, Smith id. at 104-05 held that it was reasonable for Alaska both to legislate regarding convicted sex offenders as a class and to give broad dissemination to sex offender information. In making the latter assessment, Smith, id. at 105 explained that Alaska's sex offender website was a passive notification scheme.

By contrast, as Doe highlights, Section 120(b) is not passive. But under the operative test for excessiveness--"whether the regulatory means chosen are reasonable in light of the non-punitive objective"--the fact that the notification is active rather than passive does not appear dispositive. Either scheme would qualify under the loose "reasonableness" standard. Rather, as Justice Ginsburg articulated in her dissent in Smith,

J., concurring)). Hence considerations of how Waukegan plans to implement Section 120(b) are germane to this Court's opinion's.

538 U.S. at 116-17, the vice she perceived in provisions such as Section 120(b) is not that they allow the state to provide active notification about offenders to members of the community, but instead that before doing so the state makes no determination of the dangerousness of any offender, subjects offenders to potentially lifelong notification and offers no provision for offenders' rehabilitation.[8] But the Smith majority really foreclosed any arguments on those grounds.

All in all, only Doe's contention regarding the resemblance between Section 120(b) and early punishments has force. But that does not suffice to overcome Illinois' legislative intent and to tip the Smith scale toward a finding that Section 120(b) violates the Ex Post Facto Clause--particularly when it is the only factor that points in Doe's favor.[9] As a result, Doe's claim that

---

[8] Under Section 120(b) Illinois can subject convicted sex offenders to potentially lifelong notification, despite the fact that Section 7 requires a sex offender to register for only 10 years unless adjudicated a sexually dangerous or sexually violent person or sexual predator. Given the implication of the legislatively-established time frame for registration--that after those 10 years a sex offender is no longer dangerous to the community--it is hard to appreciate why Section 120(b) notification is also not so limited. But Smith, id. at 104 held that the length of the reporting requirements in the Alaska Act-- which required registration for 15 years where an offender was convicted of a nonaggravated sexual offense, and lifetime registration for an offender convicted of either an aggravated sexual offense or two or more sexual offenses--was not excessive.

[9] This is particularly true given the general presumption of constitutionality afforded state statutes (see, e.g., Williams v. Gen. Foods Corp., 492 F.2d 399, 408 (7th Cir. 1974)).

11

Section 120(b) imposes ex post facto punishment is dismissed.

## Procedural Due Process

Doe's Complaint also stated that the Notification Law violated his right to procedural due process under the two Constitutions. But by failing to respond to Waukegan's argument on that issue, Doe has forfeited his procedural due process claim (see Lekas v. Briley, 405 F.3d 602, 614-15 (7th Cir. 2005)). Even had he not, however, any relief for a claimed violation of procedural due process is barred by Conn. Dep't of Pub. Safety v. Doe, 538 U.S. 1 (2003) and In re D.R., 342 Ill.App.3d 512, 794 N.E.2d 888 (1st Dist. 2003). Both Conn. Dep't, 538 U.S. at 7-8 and In re D.R., 342 Ill.App.3d at 516-17, 794 N.E.2d at 891-92 held that a sex offender has no right to a predeprivation hearing to prove that he or she is not currently dangerous, when dangerousness as such is not required for inclusion in the state statutory scheme.

## Substantive Due Process

Conn. Dep't, 538 U.S. at 7-8 did note, however, that a sex offender might still be able to secure relief for a violation of substantive due process (see also id. at 9 (Souter, J. concurring)). Doe makes three arguments in that respect: that Section 120(b) (1) subjects him to a state-created danger, (2) violates his right to informational privacy and (3) violates his

12

right to privacy in his family relationships.[10]

## State-Created Danger

DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989) teaches that the Due Process Clause is a limitation on the state's power to act, not an affirmative guaranty of some minimal level of safety and security. Two exceptions have developed from DeShaney: one where the state has a "special relationship" with the person (for example, if the person is in state custody) and the other if the state creates a danger for the individual that he or she would not otherwise have faced (Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993)).[11]

As Monfils v. Taylor, 165 F.3d 511, 517 (7th Cir. 1998) has reconfirmed, the elements of a state-created danger claim are

---

[10] Doe and Waukegan seem to have conflated the tests for invoking procedural due process and for invoking substantive due process. Both parties spend a substantial amount of time in their briefs discussing if Doe has met the "stigma plus" test announced in Paul v. Davis, 424 U.S. 693 (1976): whether he can show a deprivation of his liberty or property in addition to the reputational injury he alleges he will suffer from the distribution of the flyer. Although the caselaw at times discusses "stigma plus" in the context of substantive due process (see, e.g., Willan v. Columbia County, 280 F.3d 1160, 1163 (7th Cir. 2002)), it more properly applies to procedural due process challenges (see, e.g., 2 R. Rotunda & J. Nowak, Treatise on Constitutional Law §15.5 (3d ed. 1999)).

[11] It was not clear from Doe's submissions whether he was seeking to bring his "state-created danger" claim under federal law alone or under both federal and state law. With no state cases having been offered to support the claim, this Court has treated it as solely a claim for relief under 42 U.S.C. §1983.

13

"what actions did the [state actor] affirmatively take, and what dangers would [the individual] otherwise have faced?" Our Court of Appeals has found the elements of a state-created danger to have been satisfied when police remove a sober driver and replace him with a drunk driver (Reed, 986 F.2d at 1125) and when police guarantee that an anonymous tipper's tape will not be released but then later release the tape to the accused (Monfils, 165 F.3d at 518).

In this case there is no question that the state actor has taken affirmative action that affects Doe: Waukegan intends to hand out flyers containing Doe's personal information and criminal conviction. Moreover, Doe has alleged that by doing so Waukegan will subject him to physical harm and vigilante justice (Compl. ¶25).

Although it may not be true that the flyers create the danger to Doe in the first instance, for the same information is available on the Internet and at local police stations, the flyers certainly increase the danger that Doe faces. By targeting Doe, Waukegan both furthers the awareness of Doe's neighbors about his prior conviction (a fact that Waukegan concedes and that indeed animates its actions) and implicitly communicates that he is a particularly dangerous offender.[12]

---

[12] Indeed, by giving out the flyer on Doe, Waukegan may (inadvertently) communicate to his neighbors the notion that although Doe is free, he is still a criminal. For example, the

14

That the flyer contains an attached sheet with a warning that reads "Anyone who uses this information to commit a criminal act against another person is subject to criminal prosecution" does little to assuage the possibility of retributive justice, given the obvious countercurrent of the flyer--that Doe is a threat to public safety.[13]

Doe's ability to state a claim for "state-created danger," however, does not minimize the uphill battle he faces in ultimately proving that claim. As Estate of Allen v. City of Rockford, 349 F.3d 1015, 1022 (7th Cir. 2003) makes clear, the cases in which our Court of Appeals has found the "state-created danger" exception to DeShaney to apply are "rare and often egregious," involving substantial harm to the plaintiff and sufficiently reckless conduct by state actors (for which purpose Allen cited both Montils and Reed).[14]

---

flyer has an obvious resemblance to a "wanted" poster.

[13] This is particularly true where the warning comes in a printed sheet, separate from the flyer, that contains a substantial amount of other information. It is not entirely implausible that a recipient of the flyer would look only at the flyer and disregard the warning on the typed sheet attached to the flyer.

[14] Although cases asserting claims of a "state-created danger" have involved circumstances where the harm has already been inflicted, it cannot be that Doe has to roll the dice and see how his neighbors respond to the receipt of the flyer before bringing suit. If he were to present material evidence indicating that he might well face serious injury if the flyer were distributed, Doe would appear to be in a position to secure relief. In his submissions Doe alludes to such harm, in

15

Privacy

Doe also contends that the Notification Law infringes upon his constitutional right to two different types of privacy (Whalen v. Roe, 429 U.S. 589, 599-600 (1977) (footnotes omitted):

One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

As the ensuing analysis shows, Doe is unsuccessful in both of those areas.

## 1. Informational Privacy.

Doe first contends that notification pursuant to Section 120(b) violates his right to privacy because it discloses extensive information about him to the public and combines such information that would otherwise remain disaggregated. That claim must be advanced under the United States Constitution, for any such challenge under the Illinois Constitution is foreclosed by Cornelius. Although Doe suggests that Cornelius is not controlling because it involved only a challenge to Section 115(a)'s passive Internet notification and did not address active

particular citing a number of studies that document acts of harassment against registered sex offenders (see, e.g., D. Mem. I-22 n. 15). And as if to prove that such dangers are not only serious but are also directly related to the issues under consideration here, just two weeks ago two men registered in Maine as prior sex offenders were killed by a gunman, whose only "connection" to the two victims was that he had viewed their information while browsing Maine's Internet sex offender registry.

notification pursuant to Section 120(b), that active-passive distinction does not fly: Cornelius, 213 Ill.2d at 197, 821 N.E.2d at 300 explained that the sex offender's privacy claim did not turn on the manner of notification or convenience with which members of the public could access information, but rather on the "fact . . . that the sex offender registry information is already open to the public and is a matter of public record." Thus Cornelius found no privacy interest in that information (id. at 196-97, 821 N.E.2d at 300).

As for the federal Constitution, there is no similar Seventh Circuit case that controls the analysis of whether Section 120(b), either on its face or as applied, violates a sex offender's right to privacy. As to any such facial challenge, Doe "can only prevail if he demonstrates 'that no set of circumstances exist under which [Section 120(b)] would be valid'" (Joelner v. Vill. of Washington Park, Ill., 378 F.3d 613, 621 (7th Cir. 2004)). In this case there are only two differences between a facial and an as-applied challenge to Section 120(b): First, under its terms Waukegan could post information about Doe's employment, although it has chosen not to do so in its flyer. Second, Section 120(b) could apply to a sex offender even after his 10-year registration requirement concluded. And because those differences are not relevant here, virtually all of

the ensuing discussion applies to both types of challenges.

Although Denius v. Dunlap, 209 F.3d 944, 955 (7th Cir. 2000) has recognized the existence of a right to confidentiality, the scope of that right has not been clearly defined. It covers medical records and certain financial communications (see id. at 956, 958), but it is uncertain what other information such a right encompasses.[15]

To the extent that Doe claims an injury from disclosure of his sex offender status in connection with identifying physical characteristics, our Court of Appeals is in line with Paul, 424 U.S. at 713 in finding that arrest records are not protected by a right of privacy (see also Willan, 280 F.3d at 1163). Nor does Doe fare any better in arguing that the state's ability to disclose his employment information under Section 120(b) violates his right to privacy (see, e.g., Russell v. Gregoire, 124 F.3d 1079, 1094 (9th Cir. 1997)).

But not all information is created equal. Like the Court of Appeals for the Third Circuit, this Court is "not insensitive to the argument that notification implicates plaintiffs' privacy

---

[15] Denius, 209 F.3d at 957 explained that our Court of Appeals has found medical and financial information private by following the logic of the Supreme Court:

> The Supreme Court has discussed the existence and extent of constitutional protection for confidential information in terms of the type of information involved and the reasonable expectation that that information would remain confidential.

18

interest by disclosing [their] home addresses" (<u>Paul P. v. Verniero</u>, 170 F.3d 396, 404 (3d Cir. 1999)). Even though the wide availability of home addresses in telephone and Internet directories might imply that those addresses are not private, that is hardly a universal principle--many people choose not to list their telephone numbers publicly because they regard their home addresses as private information (<u>id</u>.).[16]

That proposition finds additional support in Freedom of Information Act ("FOIA") cases. For example, <u>United States Dep't of Def. v. Fed. Labor Relations Auth.</u>, 510 U.S. 487, 502 (1994) (hereafter "<u>FLRA</u>") held that the disclosure by federal agencies of employee addresses to collective bargaining representatives would constitute a "clearly unwarranted invasion of personal privacy" under Exemption 6 of FOIA and was thereby prohibited by the Privacy Act. That affirmed the like ruling by our Court of Appeals (975 F.2d 348, 353, 355 (7th Cir. 1992)).

Although such FOIA cases are not dispositive here, (see

---

[16] Moreover, as <u>Dep't of Justice v. Reporters Comm. for Freedom of The Press</u>, 489 U.S. 748, 763 (1989) (hereafter "<u>Reporters Committee</u>") underscores, looking only at whether information is "secret" may be insufficient to protect an individual's right to privacy:

> In an organized society, there are few facts that are not at one time or another divulged to another. Thus the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private.

Reporters Committee, 489 U.S. at 762 n.13), they reflect a general appreciation for "the privacy of the home, which is accorded special consideration in our Constitution, laws and traditions" (FLRA, 510 U.S. at 501). And just as was true for federal employees in the FOIA context, sex offenders may have "some nontrivial privacy interest in nondisclosure" of their home addresses (id.(emphasis in original)).

There may similarly be some nontrivial privacy interest in the aggregation of information in the proposed flyer. Aggregation is "the gathering together of information about a person .... When analyzed, aggregated information can reveal new facts about a person that she did not expect would be known about her when the original, isolated data was collected" (Daniel J. Solove, A Taxonomy of Privacy, 154 U. Pa. L. Rev. 477, 506 (2006)). Reporters Committee, 489 U.S. at 763 n.15 reconfirmed that "interests in privacy fade when the information involved already appears in the the public record," then went on to say (id. at 764):

> Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information.

Reporters Committee held that the disclosure of FBI "rap sheets" was an invasion of privacy within FOIA's Exemption 7(C). Though cases have limited that holding to the FOIA context (see,

e.g., <u>A.A. v. New Jersey</u>, 341 F.3d 206, 214 (3d Cir. 2003)), it is not entirely clear why recognizing a privacy interest in compiled data should be linked only to FOIA and not to the United States Constitution.[17]  In the context of the Notification Law, it is obvious that aggregated data about sex offenders--which exposes and links pieces of data and aspects of a sex offender's life that otherwise might remain obscure and unconnected--is materially more meaningful than any individual piece of data. Were that not so, there would be no need for registration and community notification because an individual's ability to scour police records and phone books would be sufficient to alert and protect the public.

With that said, the privacy interest in a sex offender's home address or in the compilation of data about him is not absolute.  While our Court of Appeals has not articulated a particular test for analyzing constitutional confidentiality cases, <u>Denius</u>, 209 F.3d at 956 says "it is apparent that some form of balancing test would be used."  That balancing sets (1) the public's interest in knowing information about sex offenders

---

[17] This is, of course, not to discount the additional support that <u>Reporters Committee</u>, 489 U.S. at 764-65 found for its ultimate conclusion in the "web of federal statutory and regulatory provisions that limits the disclosure of rap-sheet information."  But the holding there was primarily based on the material difference between scattered and compiled bits of information (<u>id</u>.), and that rationale applies with equal force to the United States Constitution.

21

to protect itself against (2) a sex offender's interest in keeping that same information private (see, e.g., A.A., 341 F.3d at 211). There is no doubt that the public's interest is compelling (see Paul P., 170 F.3d at 404), sufficiently so to override the sex offender's privacy interest in his home address and aggregated data. With the balance so struck, it is clear that Doe cannot state a privacy claim based on the disclosure of confidential information.

2.  Family Privacy

Doe also claims that Section 120(b) violates the second type of protected privacy interest identified in Whalen. As his Mem. 14 puts it, adapting language quoted from Paul P., 170 F.3d at 405 and reported in Doe v. Moore, 410 F.3d 1337, 1345 (11th Cir. 2005), Section 120(b) "restrict[s Doe's] freedom of action with respect to [his] famil[y] and . . . intrude[s] upon the aspect of the right to privacy that protects an individual's independence in making certain types of important decisions."

Doe also brings that challenge under both the United States and Illinois Constitutions. As to the latter, Illinois courts do not necessarily interpret their state's constitutional due process protection in lockstep with federal precedent, but they have stressed that they construe the Illinois Due Process Clause "to provide citizens with greater protections than the federal constitution only in those instances where it has 'found an

22

appropriate basis to do so'" (Trejo v. Shoben, 319 F.3d 878, 889
(7th Cir. 2003)). Here Doe has neither discussed nor pointed to
any caselaw holding (or even suggesting) that Illinois' due
process protections with respect to family autonomy and
decisionmaking sweep more broadly than the Fourteenth Amendment.
This opinion therefore looks only to the latter.

Such cases as Meyer v. Nebraska, 262 U.S. 390 (1923),
Planned Parenthood v. Casey, 505 U.S. 833 (1992) and Pierce v.
Society of Sisters, 268 U.S. 510 (1925) recognize a right to
privacy in matters relating to marriage, procreation, abortion
and family relationships (see Paul P., 170 F.3d at 405). Section
120(b) imposes no restrictions that directly impact that right:
It does not limit Doe's ability to live or work in a community
with his family or to marry or raise children. Doe can rather
complain only of the law's indirect effects--actions that
community members may take as a result of learning about his past
conviction and assessing for themselves his future dangerousness.

But "collateral consequences of regulations not directed at
the family . . . do not bring the constitutional rights of family
association into play" (Hameetman v. City of Chicago, 776 F.2d
636, 643 (7th Cir. 1985)). Indeed, were that the case,
"[b]reathtaking vistas of liability would open up" (id.): Every
conviction, which necessarily entails some publicity that impacts
an offender's family, would give rise to a constitutional claim.

In sum, like Doe's other privacy-based claim, that based on his right to family relationships fails.

## Vagueness

Doe raises an additional claim that Section 120(b) violates both constitutions' Due Process Clauses, this time on grounds of unconstitutional vagueness. Just as was true for his family privacy claim, the absence of any authority suggesting a broader sweep for the Illinois Due Process Clause calls for a focus on federal caselaw.

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes omitted) provides the classic articulation of the problem with vague laws:

First, because we assume that man is free to steer between
lawful and unlawful conduct, we insist that laws give the
person of ordinary intelligence a reasonable opportunity to
know what is prohibited so that he may act accordingly.
Vague laws may trap the innocent by not providing fair
warning. Second, if arbitrary and discriminatory
enforcement is to be prevented, laws must provide explicit
standards for those who apply them. A vague law
impermissibly delegates basic policy matters to policemen,
judges, and juries for resolution on an ad hoc and
subjective basis, with the attendant dangers of arbitrary
and discriminatory application.

Here, of course, fair notice is not at issue. Doe argues instead that Section 120(b) is devoid of any standards to guide the police in its implementation and enforcement (D. Mem. II-5).

Because Section 120(b) reaches only a narrow slice of constitutionally protected conduct, Doe's success on that claim must depend on a showing that the Notification Law "is

24

impermissibly vague in all of its applications"--which includes
its application to him (Fuller ex. rel. Fuller v. Decatur Public
Sch. Bd., 251 F.3d 662, 667 (7th Cir. 2001)).[18]  Vill. of Hoffman
Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498
(1982) has held that "[t]he degree of vagueness that the
Constitution tolerates . . . depends in part on the nature of the
enactment"  Where an enactment imposes only civil rather than
criminal penalties, the Constitution affords greater linguistic
latitude "because the consequences of imprecision are
qualitatively less severe" (id. at 498-99).

   That is not a bright-line distinction, for a court may find
an ordinance is "quasi-criminal" because of its stigmatizing
effect and evaluate it under a more stringent test (id. at 499;
see also Brockert v. Skornicka, 711 F.2d 1376, 1382 (7th Cir.

---

[18] That proposition, first announced in United States v.
Salerno, 481 U.S. 739, 745 (1987), is not without dispute in the
context of the vagueness doctrine.  For example, in City of
Chicago v. Morales, 527 U.S. 41, 55 n. 22, 71-73 (1999) both
Justice Stevens (speaking for the Court) and Justice Breyer (in
concurrence) found facial challenge was appropriate where a
statute did not provide minimal standards to govern law
enforcement, regardless of whether it could appropriately be
applied in the circumstances of that case.  As Justice Breyer
said (id. at 71)(emphasis in original)):

   I see no way to distinguish in the ordinance's terms between
   one application of that discretion and another.  The
   ordinance is unconstitutional, not because a policeman
   applied this discretion wisely or poorly in a particular
   case, but rather because the policeman enjoys too much
   discretion in every case.  And if every application of the
   ordinance represents an exercise of unlimited discretion,
   then the ordinance is invalid in all its applications.

25

1983)). In any event, "the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights"--where it does, the Constitution demands that the courts apply a rigorous vagueness test (Hoffman Estates, 455 U.S. at 499).

No concrete guidelines are prescribed for courts seeking to make a substantive determination about whether a statute is vague. Caselaw, however, does indicate that vagueness analyses tend to include an evaluation not only of the clarity and precision of the language but also of the practicability of using more exacting terms to cabin the discretion of those applying the law (see, e.g., Kolender v. Lawson, 461 U.S. 352, 361 (1983)).

For his part, Doe appears to take issue with two aspects of Section 120(b), arguing that each is impermissibly vague.[19] Because Section 120(b) has a stigmatizing effect on offenders

---

[19]Doe does not contend that the terms "sex offender" or "sexual predator" as they appear in Section 120(b) are unclear. Instead he argues that Section 120(b) is vague because it does not require the police to calibrate public dissemination based on an assessment of an offender's dangerousness (D. Mem. II-8). But that is not really a vagueness problem. And to the extent that it more appropriately raises procedural or substantive due process concerns, Doe faces substantial hurdles in making his case: Smith, 538 U.S. at 103-04 made clear that it is reasonable for states to legislate with respect to sex offenders as a class, and Conn. Dep't, 538 U.S. at 7-8 held that under statutes such as the Notification Law an offender is not entitled to a determination as to his dangerousness before that offender is subject to public notification.

26

and, albeit to a limited degree, impacts an offender's right to privacy, this opinion will apply a somewhat more stringent vagueness test in assessing both of Doe's challenges.

First, Doe argues that "[t]here are absolutely no standards regarding who is 'likely to encounter a sex offender,' and thus eligible to receive a Section 120(b) disclosure" (D. Mem. I-9 n. 6; see also D. Mem. II-5). Despite Doe's protestations, "likely to encounter" passes constitutional muster, for it is relatively clear and susceptible to interpretation. For example, Doe v. Poritz, 662 A.2d 367, 385 (N.J. 1995) evaluated identical language in the context of New Jersey's Megan's Law. Poritz, id. held that "likely to encounter" means "having a fair chance to encounter" and "includes the immediate neighborhood of the offender's residence and not just the people next door."

Moreover, given the different geographical contexts in which such a statute must operate, the Illinois General Assembly could not have been more precise: It otherwise would have had to write into Section 120(b) separate geographical limits for notification for cities, suburbs and rural areas, to name just a few of the multiple possibilities. And finally, although some police department could perhaps interpret "likely to encounter" in an overexpansive manner as Doe contends, in this case Waukegan has proposed limiting its dissemination of Doe's flyer to individuals living within 500 feet of Doe's residence. That ascribes a

reasonable scope to the "likely to encounter" concept.

Second, Doe claims that the complete absence of any prescribed method for notifying those "likely to encounter a sex offender" dooms Section 120(b) (D. Mem. I-9). There is no question that the General Assembly could have set forth the methodology for Section 120(b) notification--indeed, it did so for public disclosure under Section 120(c).[20] But even absent such delineation, the manner of community notification is not without restrictions: Police discretion is necessarily limited by the fact that only those "likely to encounter a sex offender" are entitled to information about such an offender.[21] For example, it would be improper under the statute to post information about a sex offender on a random street corner or on a nationally-televised program, because individuals not likely to

---

[20]Section 120(c) provides in part:

> The sheriff or a municipal police department may publish the photographs of sex offenders where any victim was 13 years of age or younger and who are required to register in the municipality or county under the Sex Offender Registration Act in a newspaper or magazine of general circulation in the municipality or county or may disseminate the photographs of those sex offenders on the Internet or on television.

[21] Similarly, Section 120(a) sets out no particular manner of notification for police disclosing sex offender information to school boards and child care facilities, but the methods employed for such notification are necessarily limited by the fact that only school boards and child care facilities are entitled to such information. Section 117 additionally calls for regulations to specify which school boards and child care facilities are to be to notified under the Notification Law.

encounter that offender would then receive that information.[22]
Here by contrast, Waukegan has proposed to distribute flyers only
to Doe's neighbors living within 500 feet of his residence.

Indeed, it is not (as Doe would have it) that Section 120(b)
allows for "standardless" police discretion, leading to arbitrary
and discriminatory enforcement (see Grayned, 408 U.S. at 113
n.22).Instead the statute provides at least the "minimal
guidelines to govern law enforcement," as required by the
Constitution (see Kolender, 461 U.S. at 358). It delineates to
whom the statute may apply (all sex offenders), to whom
information can be given (those "likely to encounter" a sex
offender) and what information about the sex offender can be
disclosed (see Section 120(b)(1)to(5)), and it limits the manner
of public notification.

Notably, Doe does not charge that either the language or
structure of Section 120(b) permits officers to implement that
statute in a way that impermissibly discriminates against him.
Doe simply alleges that the discretion in Section 120(b) allows
for uneven enforcement--a potential problem common to all

---

[22] To be sure, some of the hypotheticals that Doe posits as
possible under Section 120(b)--things such as the police driving
a sound truck up Doe's street announcing that Doe is a sex
offender--are very troubling (D. Mem. I-9). But those
hypotheticals do not pose a further vagueness challenge and are
best addressed, should they arise, under other constitutional
doctrines (cf. Anderson v. Romero, 72 F.3d 518, 523 (7th Cir.
1995)).

statutes and a contention better raised, as he has done, as an equal protection challenge (see St. Croix Waterway Ass'n v. Meyer, 178 F.3d 515, 521 (8th Cir. 1999)).

Doe's claim of unconstitutional vagueness thus also succumbs to analysis. It too is dismissed.

## Unconstitutional Delegation of Power

Closely linked to his vagueness challenge, Doe also charges that Section 120(b) is an unconstitutional delegation of power under the Illinois Constitution.[23] Like the vagueness doctrine, the nondelegation doctrine is concerned with whether there are sufficient standards "given in the statute to guide the conduct the statute regulates and the administrative body that oversees that conduct" (E. St. Louis Fed'n of Teachers, Local 1220 v. E. St. Louis Sch. Dist. No. 189 Fin. Oversight Panel, 178 Ill.2d 399, 423, 687 N.E.2d 1050, 1064 (1997) (hereafter "Local 1220"). Delegation analysis is animated by separation of powers and not due process concerns, and it applies a separate test for determining a statute's validity (id):

> To be a proper delegation of legislative authority, the statute in question must identify three factors: (1) the persons or activities potentially subject to regulation; (2) the harm sought to be prevented; and (3) the general means

---

[23] Doe raised that claim in his Amended Complaint and initial memorandum requesting injunctive relief. Although he did not head a section of his brief "Unconstitutional Delegation" or discuss it extensively, he has preserved the issue by dealing with it in the section of his later memorandum that addressed "Unconstitutional Vagueness" (D. Mem. II-9-10).

available to the administrator to prevent the identified harm.

Section 120(b) satisfies those requirements: It is made applicable only to individuals convicted of a sex offense, its purpose is clear (to protect the public against recidivist sex offenders) and it lays out generally the means available to achieve its purpose (community notification). To be sure, it does not specifically articulate how notification is to be implemented, although it does contain some constraints on police discretion as noted above. But to satisfy the "general means" prong of the delegation test, the law need not be particular--it need only state the tools by which the harm will be prevented (see S. 51 Dev. Corp. v. Vega, 335 Ill.App.3d 542, 553-54, 781 N.E.2d 528, 538 (1st Dist. 2002)). That criterion is clearly met here. Consequently, Doe's claim that Section 120(b) impermissibly delegates authority to the police is also dismissed.

## Equal Protection of the Law

Finally, Doe raises a "class of one" equal protection challenge under both Constitutions to the application of Section 120(b). On that score Doe argues that he is being treated differently by Waukegan--which intends to implement Section 120(b), than he was by North Chicago, which never actively distributed information about him under the Notification Law.

Equal protection analysis is identical under the two

31

Constitutions (see <u>Wauconda Fire Prot. Dist. v. Stonewall</u>

<u>Orchards LLP</u>, 214 Ill.2d 417, 434, 828 N.E.2d 216, 226 (2005)).

And both our Court of Appeals and the Illinois courts have been

less than precise in marking out the boundaries for a "class of

one" claim (see e.g., <u>Racine Charter One, Inc. v. Racine Unified</u>

<u>Sch Dist</u>, 424 F.3d 677, 684 (7th Cir. 2005); <u>LaSalle Nat'l Bank</u>

<u>v. City of Highland Park</u>, 344 Ill.App.3d 259, 280, 799 N.E.2d

781, 798 (2d Dist. 2003)). As <u>Racine Charter One</u>, 424 F.3d at

684 (citations omitted) described the situation:

> In one line of cases, panels of this court have held that a
> class of one equal protection claim is established where the
> defendant has intentionally treated the plaintiff
> differently than others similarly situated either without
> any rational basis for doing so or out of some "totally
> illegitimate animus." In another line, however, we have
> held that the mere absence of a rational basis is not enough
> to sustain the class of one claim, and that instead the
> plaintiff must prove illegitimate animus in order to
> succeed.[24]

Whichever of those standards is applied, Doe cannot state a

claim for a violation of his right to equal protection under the

law. Our Court of Appeals has repeatedly said that a plaintiff

cannot make out a "class of one" case based on uneven law

enforcement, unless imposed for some invidious purpose (see

<u>Tuffendsam</u>, 385 F.3d at 1127-28). Here Doe has made no assertion

---

[24] <u>Tuffendsam v. Dearborn County Bd. of Health</u>, 385 F.3d
1124, 1127 (7th Cir. 2004) tried to reconcile those two
"divergent strands in the case law" by interpreting the
requirement of intentionality as meaning "made worse off
than ... others"--or, rather, when an official "acts because
rather than in spite of a particular consequence.

that Waukegan is enforcing the law because of discriminatory animus, as because Doe is of a certain race. So Doe's claims charging a violation of his equal protection rights are dismissed as well.

## Conclusion

When the chips are finally counted, Doe is left with only one surviving claim: that Section 120(b) violates substantive due process. And even that claim advances on only one of the grounds that Doe has asserted: the state-created danger theory. All of Doe's remaining claims are dismissed with prejudice.[25]

That being said, however, the limited constitutional scope on which Doe has prevailed--due in large part to the separation of his claims into separate strands and to the adverse caselaw applicable to each strand--is disquieting. After all, it is not that Doe has failed to make compelling arguments on the rejected claims--he has indeed, although those arguments were not strong enough to overcome the heavy weight of precedent. It will be remembered that the Lilliputians immobilized Gulliver by lashing

---

[25]This partial success of Doe's efforts should not be permitted to obscure the first-rate work done on his behalf by his appointed pro bono counsel, Bernard Nussbaum, Esq., and the law firm associates who worked with attorney Nussbaum on the case In every instance the advancement of theories seeking Doe's possible recovery and the arguments in support of the complex legal issues involved were presented in the best professional tradition, but the hurdles posed by the existing caselaw were too high to surmount. This Court's thanks are extended to attorney Nussbaum and his associates for their efforts.

him to the ground with gossamer threads that could never have done the job if only their individual strength had been involved. Just so here, while Doe's unsuccessful arguments have not been surficient to state constitutional claims for relief on their own, a number of those arguments may well bear on the evaluation and application of his surviving claim for a violation of his substantive due process rights.

Finally, this Court notes that at this point the temporary restraining order, as previously agreed upon by the parties, remains in effect. This action is set for a status hearing at 9 a.m. on May 11, 2006 to discuss further proceedings in this action.

Milton I. Shadur
Senior United States District Judge

May 4, 2006

34